UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

PETER DAO,

                Plaintiff,

   -against-

OPPENHEIMERFUNDS, INC.,

                Defendant.

------------------------------------------------------------------x

10 Civ. 8413

COMPLAINT

ECF CASE

PLAINTIFF DEMANDS
A TRIAL BY JURY

Plaintiff Peter Dao ("Dao" or "plaintiff"), by his counsel, complaining of defendant OppenheimerFunds, Inc. ("Oppenheimer" or "defendant"), alleges as follows:

## NATURE OF CLAIM

1. This action is brought to remedy discrimination on the basis of race and national origin as well as retaliation for opposition to unlawful discriminatory practices, in violation of federal and city anti-discrimination laws, including Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL").

2. Plaintiff seeks declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Section 1981 and the NYCHRL.

## PARTIES, JURISDICTION AND VENUE

3. Defendant Oppenheimer is an asset management company that offers products and services to individuals, corporations and institutions.

4. Dao is a forty-one year old Chinese-American man who currently resides in Stamford, Connecticut. Dao was born in Vietnam and moved to the United States when he

was ten years old. From approximately August 2008 through May 2010, Oppenheimer employed Dao.

5. As the Southern District of New York is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2).

6. Pursuant to § 8-502(c) of the NYCHRL, plaintiff will serve a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

7. This Court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The Court has supplemental jurisdiction over plaintiff's NYCHRL claims pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

Dao's Background

8. On or about August 11, 2008, Oppenheimer hired Dao on a full time basis as Vice President and 529 Client Relationship Manager ("CRM"). A 529 plan, named after the applicable provision of the Internal Revenue Code, is an education savings plan operated by a state or educational institution designed to help families set aside funds for future college costs. The principal duties of a 529 CRM are to maintain existing government-client relationships and to develop new business by participating in the Request for Proposal ("RFP") process for state governments seeking management for their 529 plans.

9. Dao was exceptionally well qualified to become a 529 CRM at Oppenheimer. He graduated with a bachelor's from Amherst College and a joint master's in public affairs and urban regional planning from Princeton University. Moreover, Dao is a

Certified Financial Planner professional and holds the FINRA General Securities Principal Series 24, Series 7, Series 63, and Series 65 licenses.

10. Before joining Oppenheimer, Dao worked as Senior Director of Institutional Relationship Management at Upromise Investments, Inc., where he managed and marketed 529 college savings programs through employer and community group channels. In that role, he also served as relationship manager for the state of New York and Hawaii. Dao also formerly served as a senior consultant with TIAA-CREF in the Tuition Financing Division. In addition, Dao was a Financial Advisor at Mellon Advisor Services and managed investments for high net-worth clients totaling over $175 million.

11. At the time of Dao's hire by Oppenheimer, his immediate supervisor was Raquel Granahan ("Granahan"), the Senior Vice President and Director of 529 programs. Granahan reported to Donna Winn, who was then the President and CEO of OFI Private Investments Inc. ("OFIPI"), a subsidiary of Oppenheimer.

Dao is Subject to Discriminatory Treatment At Oppenheimer

12. At the time of Dao's hire, he was the only Chinese-American professional who worked in Oppeneheimer's 529 Group.

13. Although a CRM with Dao's experience and credentials are typically responsible for leading a relationship with one or more clients, Granahan did not give any such assignments to Dao upon his hire. Instead, Granahan principally assigned Dao to "back office" duties, including operational and administrative responsibilities related to the State of Illinois' 529 plan. In addition, when several state clients sued Oppenheimer for alleged mismanagement, Granahan assigned Dao to work with Oppenheimer's lawyers to perform due diligence and document review.

14. Granahan also directed Dao to "shadow" Dan Herrmann ("Herrmann"), who was then the 529 CRM for Oppenheimer's relationship with the State of Illinois. In shadowing Herrmann, Dao had minimal interaction with the with the Treasurer's Office of the State of Illinois, which was the client contact for the Illinois relationship.

15. Herrmann was significantly less qualified than Dao to lead a 529 client relationship. For example, Herrmann did not have the requisite FINRA licenses to give investment advice or sell securities, both routine functions of a CRM. Nor did Herrmann have any experience working as a 529 CRM prior to becoming employed by Oppenheimer.

16. As of the date Dao began to work for Oppenheimer, four CRM's, including Herrmann, had lead responsibility for Oppenheimer's 529 client relationships. Each of these CRM's was Caucasian and, on information and belief, each was born in the United States.

17. Within a few weeks of Dao's hire, Bruce Sheinhaus ("Sheinhaus"), who is Caucasian, joined the 529 Group as a CRM. Sheinhaus' credentials and experience in the 529 business are similar to Dao's. Upon Sheinhaus' hire, he was immediately assigned to lead the Oppenheimer's relationship with the State of Oregon.

18. At or about the time that Oppenheimer hired Sheinhaus, Dao asked Granahan why he had not been assigned to lead a 529 client relationship. In response, Granahan told Dao that he did not "fit the image" for a client facing or external role. When questioned by Dao what that meant, Granahan declined to elaborate. However, it was clear to Dao that Granahan was referring to his Chinese background. There is nothing about Dao's "image" that should have prevented him from leading a client relationship, given his skills and experience.

19. Within the first year after Oppenheimer hired Dao, all of the other 529 CRMs were given opportunities to represent Oppenheimer at 529 trade conferences and meetings. Dao was never afforded such an opportunity, despite his repeated requests to do so.

20. On or about December 11, 2008, Dao reported to Granahan that Herrmann was mismanaging the Illinois relationship and making inaccurate and misleading statements to the client. Dao again asked why he did not have primary responsibility for the Illinois client relationship or any other. Granahan again told Dao that he did not fit a "certain image" and therefore could not have responsibilities that involved direct client interaction.

21. During this same meeting, Granahan screamed and cursed at Dao, which she also did on several other subsequent occasions. On information and belief, Granahan did not speak to non-Chinese employees in this type of degrading and humiliating manner.

22. In or about December 2008, Dao informed Priscilla Upshaw, the office manager for the 529 group, his belief that Granahan was treating him in an unfair and discriminatory manner.

23. In or around September 2009, Oppenheimer hired Kim Evans ("Evans"), an African American woman, to the new position of Vice President and Director of Client Relations Managers for the 529 Group. In this role, Evans became responsible for supervising Dao and the other 529 CRM's. Oppenheimer never posted this opportunity and, therefore, Dao was not permitted to apply for the job.

24. Prior to Evans joining Oppenheimer, she had no experience working with 529 plans. Her most recent position before joining Oppenheimer was as the co-owner of an interior design firm. Dao was significantly more qualified for the position that Oppenheimer gave to Evans.

25.    On or about October 1, 2009, Granahan informed Dao that he would be the sole CRM for the Illinois relationship. Herrmann was removed from the Illinois relationship at the request of the client. However, Herrmann was not dismissed, but rather was permitted to spend his time studying for the FINRA Series 7 exam.

26.    On or about November 13, 2009, Granahan threatened to fire Dao because he filed a grievance with the Certified Financial Planner Board of Standards, on his own letterhead, regarding the unethical conduct of a Certified Financial Planner at another investment firm. Before filing the grievance, Dao had repeatedly told Evans that he planned to do so. Evans never instructed Dao not to file the grievance. Nevertheless, Granahan falsely stated that Dao, in submitting the grievance, had acted in an insubordinate manner.

Dao Files an Internal Discrimination Complaint and is Subject to Retaliation

27.    On or about November 23, 2009 Dao sent a memo to Oppenheimer Human Resources, regarding, among other issues, discriminatory hiring practices within the 529 group. In the memorandum, Dao complained about the discriminatory hiring of Evans as well as a junior member of 529 group.

28.    On or about December 8, 2009, Dao had a conversation with Jim Phillips ("Phillips"), Senior Vice President of Human Resources regarding the content of his memo. In addition, Dao explained to Phillips that he been victim of discrimination because of his Chinese background.

29.    On or about December 22, 2009 Dao met with Phillips again. Phillips informed Dao that Oppenheimer's human resources department had concluded that Dao had not been discriminated against.

30. On or about January 7, 2010, Dao met again with Phillips. Dao told Phillips that he was dissatisfied with Oppenheimer's response to his complaint, and that he planned to seek legal advice from an attorney. Phillips stated that it was a bad idea for Dao to speak with an attorney and attempted to dissuade him from doing so.

31. On or about April 15, 2010, Dao met with Libby to discuss his complaint to human resources and how Granahan's bias was affecting the 529 Group. Libby dismissed Dao's complaint and told that it was simply "a matter of [his] opinion."

32. On or about May 3, 2010, Granahan informed Dao that he was being fired, effective immediately. Granahan said that Dao's dismissal was due to a reduction in force, and did not have anything to do with his performance.

33. Before Oppenheimer fired Dao, the firm was aware that representatives of the Illinois State Treasurer's Office, with whom Dao closely worked on the Illinois 529 Plan, were very satisfied with Dao's performance. Nevertheless, Oppenheimer dismissed Dao and replaced him in the Illinois relationship with William Raynor ("Raynor"), a Caucasian CRM. In addition, following Dao's dismissal, William McNamara ("McNamara"), who is also Caucasian, was promoted to CRM to assist Raynor with the Illinois 529 Plan. McNamara had no previous experience as a CRM.

34. When Dao was dismissed, Oppenheimer retained CRM's whose qualifications and work performance were inferior to Dao's, including Raynor, McNamara, Richard Walsh and Alyson Frost, all of whom are Caucasian.

35. Dao was targeted for dismissal because of his race, national origin and because he opposed Oppenheimer's discriminatory practices.

## FIRST CAUSE OF ACTION

### Discrimination Under Section 1981

36. Plaintiff repeats and realleges paragraphs 1-35 as if fully set forth herein.

37. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of his employment on the basis of his race, in violation of Section 1981.

38. Plaintiff is now suffering and will continue to suffer monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

39. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## SECOND CAUSE OF ACTION

### Retaliation Under Section 1981

40. Plaintiff repeats and realleges paragraphs 1-39 as if fully set forth herein.

41. By the acts and practices described above, defendant retaliated against plaintiff because he opposed unlawful discrimination.

42. Plaintiff is now suffering and will continue to suffer monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

43. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## THIRD CAUSE OF ACTION

### Race/National Origin Discrimination Under the NYCHRL

44. Plaintiff repeats and realleges paragraphs 1-43 as if fully set forth herein.

45. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of his employment on the basis of his race and national origin, in violation of the NYCHRL.

46. Plaintiff is now suffering and will continue to suffer monetary damages and damages for monetary anguish and humiliation as a result of defendants' discriminatory acts.

47. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

### FOURTH CAUSE OF ACTION

### Retaliation Under the NYCHRL

48. Plaintiff repeats and realleges paragraphs 1-47 as if fully set forth herein.

49. By the acts and practices described above, defendants retaliated against plaintiff he opposed unlawful discrimination, in violation of the NYCHRL.

50. Plaintiff is now suffering and will continue to suffer monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

51. Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a) Declaring the acts and practices complained of herein in violation of Section 1981 and the NYCHRL;

(b) permanently restraining these violations;

(c) directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendants to place plaintiff in the position he would be in but for defendants' discriminatory and retaliatory treatment of him, and to make him whole for all earnings he would have received but for defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, pension, interest and other lost benefits;

(e) awarding plaintiff compensatory damages for his emotional distress and humiliation;

(f) awarding plaintiff pre-judgment and post-judgment interest, as well as reasonable attorney's fees and the costs of this action;

(g) awarding plaintiff damages relating to adverse tax consequences; and

(h) awarding such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       November 8, 2010

                                THE LAW OFFICE OF
                                KEVIN MINTZER, P.C.

By: _____
        Kevin Mintzer (KM 4741)
        Attorney for Plaintiff
        1350 Broadway – Suite 1400
        New York, New York 10018
        Tel: (646) 843-8180
        Fax: (646) 478-9768
        km@mintzerfirm.com